# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**MARIA A. GALLEGOS,**

 Plaintiff,

 v.                      Case No. 19-CV-1642-SCD

**ANDREW M. SAUL,**
**Commissioner of Social Security,**

 Defendant.

## DECISION AND ORDER

  Maria A. Gallegos applied for Social Security benefits in 2016, alleging that she is disabled due to various physical and mental impairments. Following a hearing, an administrative law judge (ALJ) denied benefits in 2019, finding that Gallegos remained capable of working notwithstanding her impairments. Gallegos now seeks judicial review of that decision, arguing that the ALJ erred in weighing the opinion of her primary care physician and in relying upon the testimony of a vocational expert (VE) concerning the number of available jobs she could still perform. The Commissioner contends that the ALJ did not commit an error of law in reaching his decision and that the decision is otherwise supported by substantial evidence. I conclude that the ALJ committed reversible error in weighing the opinion of Gallegos' primary care physician and in failing to ensure that the VE's testimony was reliable. Because the ALJ's findings at step four and five are not supported by substantial evidence, the decision denying Social Security benefits to Gallegos will be reversed and this matter will be remanded for further proceedings.

## BACKGROUND

Gallegos was born January 9, 1974, in Mexico. R. 792.[1] After completing eighth grade, she dropped out of school to work. *Id.* She got married in 1993, and soon thereafter she and her new husband immigrated to the United States, eventually settling in Milwaukee. *Id.* In the United States, Gallegos worked for fifteen years as a planter at a tree nursery. R. 70, 310. She stopped working in May 2014 when she became pregnant with her fifth child and decided to stay at home with her children. R. 309–10, 792–93. In 2015, Gallegos began experiencing pain in her hands and fingers. R. 309. Around that same time, she started feeling depressed about the family's finances and inability to pay bills. R. 309–10.

In early 2016, Gallegos applied for disability insurance benefits and supplemental security income from the Social Security Administration (SSA), alleging that she became disabled on her last day of work (May 19, 2014), when she was forty years old. R. 267–81. Gallegos asserted that she was unable to work due to rheumatoid arthritis, an enlarged thyroid, a ventral hernia, migraine headaches, and depression. R. 309. After her applications were denied at the state-agency level, Gallegos requested an administrative hearing before an ALJ. R. 207–08. Gallegos, along with her attorney, appeared in person before ALJ Peter Kafkas on August 8, 2018. R. 46–100. Gallegos testified that she suffers from chronic pain in her knees, hips, hands, and left foot. R. 61–63. She also reported seeing a therapist and taking medication for mental-health issues. R. 65–69.

Leslie Goldsmith testified at the hearing as a VE. *See* R. 78–95. Goldsmith indicated that Gallegos had only one past relevant job: a horticultural worker, which was unskilled and performed at the medium exertional level. R. 79–80. According to Goldsmith, a hypothetical

---
[1] The transcript is filed on the docket at ECF No. 11-3 to ECF No. 11-26.

person with Gallegos' age, education, and work experience could not perform the horticultural job if she were limited to a restricted range of light work, but she could work as a mail clerk (DOT Code 209.687-026), in food processing or food preparation (DOT Code 316.674-014), and in cleaning or housekeeping (DOT Code 323.687-014). R. 80–82. Goldsmith estimated that there were approximately 100,000 mail clerk jobs; 400,000 food prep jobs; and 1,000,000 light-duty cleaning jobs in the national economy. R. 81–82. He arrived at those numbers by "extrapolating" from the data provided in the Bureau of Labor Statistics' (BLS) *Occupational Employment Survey* (OES) and modifying the government-produced numbers by "[a]bout 50 percent." R. 91–92.

Applying the standard five-step process, *see* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), on January 17, 2019, the ALJ issued a written decision concluding that Gallegos was not disabled. *See* R. 13–45. The ALJ determined that Gallegos had not engaged in substantial gainful activity since May 19, 2014, her alleged onset date. R. 23. The ALJ found that Gallegos' severe impairments—osteoarthritis, fibromyalgia, lumbar and cervical degenerative disc disease, and depressive disorder—limited her ability to work but didn't meet or equal the severity of a presumptively disabling impairment. R. 24–27.

The ALJ next determined that Gallegos had the residual functional capacity (RFC) to perform light work with the following additional limitations and allowances:

- She can occasionally balance, crouch, kneel, stoop, and climb ramps and stairs, but she should never climb ladders, ropes, and scaffolds.

- She can frequently reach bilaterally, frequently reach overhead bilaterally, frequently handle bilaterally, frequently finger bilaterally, and frequently feel bilaterally.

- She must avoid concentrated exposure to dangerous moving machinery, unprotected heights, extreme cold, and excessive vibration.

- She is limited to understanding, carrying out, and remembering no more than simple instructions.

- She can perform simple routine tasks.
- She can work in an environment free of fast-paced production requirements.

- She can perform work involving only simple, work-related decisions and work involving few, if any, workplace changes.

- She should be employed in a low-stress job, defined as having only occasional decision making required and only occasional changes in the work setting.

- She is allowed to be off-task 10% of the day, in addition to regularly scheduled breaks.

R. 27. In assessing his RFC, the ALJ assigned "little weight" to the opinion of Thomas Bachhuber, MD, Gallegos' primary doctor. R. 33–34. The ALJ determined that, in light of the above RFC, Gallegos could not perform her past relevant job as a horticultural worker, but, based on the VE's testimony, she could work as a mail clerk, in food prep, and in cleaning or housekeeping; therefore she was not disabled. R. 38–39.

The ALJ also overruled Gallegos' objections to the VE's testimony. According to the ALJ, "[t]he vocational expert is qualified to provide testimony based on his professional knowledge and experience," Gallegos' lawyer "failed to ask the vocational expert any questions regarding his qualifications and specifically did not raise an objection during the hearing when given the opportunity," and, despite pointing out unreliable methods for estimating job numbers, Gallegos' lawyer "did not inquire as to whether to vocational expert actually relied on any of these presumed discredited sources." R. 21. The ALJ further determined that "the [job] numbers provided [by the VE] were based upon his education, training, and experience." *Id.*

After the SSA's Appeals Council denied review, *see* R. 1–8, making the ALJ's decision the final decision of the Commissioner of Social Security, *see Loveless v. Colvin*, 810 F.3d 502,

506 (7th Cir. 2016), Gallegos filed this action on November 8, 2019. ECF No. 1. The matter was reassigned to me in April 2020 after all parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 18, 19. The matter is fully briefed and ready for disposition. *See* ECF Nos. 16, 29, 30.

## APPLICABLE LEGAL STANDARDS

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have the power to affirm, reverse, or modify the Commissioner's decision, with or without remanding the matter for a rehearing.

Section 205(g) of the Act limits the scope of judicial review of the Commissioner's final decision. *See* § 405(g). As such, the Commissioner's findings of fact shall be conclusive if they are supported by "substantial evidence." *See* § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (other citations omitted). The ALJ's decision must be affirmed if it is supported by substantial evidence, "even if an alternative position is also supported by substantial evidence." *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) (citing *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992)).

Conversely, the ALJ's decision must be reversed "[i]f the evidence does not support the conclusion," *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003)), and reviewing courts must remand "[a] decision that lacks adequate discussion of the issues," *Moore*, 743 F.3d at 1121 (citations omitted). Reversal also

5

is warranted "if the ALJ committed an error of law or if the ALJ based the decision on serious factual mistakes or omissions," regardless of whether the decision is otherwise supported by substantial evidence. *Beardsley*, 758 F.3d at 837 (citations omitted). An ALJ commits an error of law if his decision "fails to comply with the Commissioner's regulations and rulings." *Brown v. Barnhart*, 298 F. Supp. 2d 773, 779 (E.D. Wis. 2004) (citing *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991)). Reversal is not required, however, if the error is harmless. *See, e.g.*, *Farrell v. Astrue*, 692 F.3d 767, 773 (7th Cir. 2012); *see also Keys v. Barnhart*, 347 F.3d 990, 994–95 (7th Cir. 2003) (citations omitted).

In reviewing the record, this court "may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, reviewing courts must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley*, 758 F.3d at 837 (citing *Blakes*, 331 F.3d at 569; *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)). Judicial review is limited to the rationales offered by the ALJ. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## ANALYSIS

Gallegos contends the ALJ erred in weighing the opinion of Dr. Bachhuber and in relying on the VE's job-number testimony.

6

### I. Dr. Bachhuber

"For claims filed before March 2017, a treating physician's opinion on the nature and severity of a medical condition is entitled to controlling weight if it is well-supported by medical findings and consistent with substantial evidence in the record." *Johnson v. Berryhill*, 745 F. App'x 247, 250 (7th Cir. 2018) (citing 20 C.F.R. § 404.1527(c)(2); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016)); *see also* SSR 96-2p, 1996 SSR LEXIS 9, at *1–4 (July 2, 1996). An opinion that is not entitled to controlling weight need not be rejected. Instead, the opinion is entitled to deference, and the ALJ must weigh it using several factors, including the length, nature, and extent of the claimant's relationship with the treating physician; the frequency of examination; whether the opinion is supported by relevant evidence; the opinion's consistency with the record as a whole; and whether the physician is a specialist. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c); *see also Ramos v. Astrue*, 674 F. Supp. 2d 1076, 1087 (E.D. Wis. 2009). Moreover, the ALJ must always give "good reasons" to support the weight he ultimately assigns to the treating physician's opinion. *See* §§ 404.1527(c), 416.927(c)(2); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010).

Dr. Bachhuber has been Gallegos' primary care physician since at least 2006. *See* R. 356, 797. He was asked in November 2016 to make a statement in support of Gallegos' disability claim. *See* R. 797. In response, Dr. Bachhuber wrote that Gallegos was disabled and unable to work due to pain in her fingers, hands, elbows, and knees. R. 797. A few weeks later, Dr. Bachhuber completed a medical source statement in which he opined that Gallegos could sit for thirty minutes at a time, stand for thirty minutes at a time, sit for less than two hours in an eight-hour work day, and stand/walk for less than two hours in a workday. R. 933. Dr. Bachhuber further opined that Gallegos needed to walk around for about fifteen minutes every

7

hour and would need frequent breaks. *Id.* According to Dr. Bachhuber, Gallegos could not lift even ten pounds in a competitive work environment; she could never twist, stoop, crouch/squat, climb ladders, handle, finger, or reach; and she could rarely climb stairs. R. 934. Dr. Bachhuber also opined that Gallegos' symptoms would cause her to be off task twenty-five percent or more of the workday, that Gallegos was incapable of even low-stress work, and that she would miss more than four days of work per month as a result of her impairments or treatment. R. 935.

The ALJ assigned little weight to Dr. Bachhuber's opinions, finding them inconsistent with the record. R. 33. The ALJ rejected Dr. Bachhuber's statement of disability because the disability finding is "reserved for the Commissioner alone." R. 33. The ALJ also rejected the significant functional limitations contained in the medical source statement. According to the ALJ, physical examinations showed that Gallegos could perform light exertional work, as "she had some reduced range of motion to normal range of motion; she was able to move all her extremities equally; she had normal gait without the use of an assistive device or ataxia; she had no cranial nerve deficit; she had normal strength in her upper and lower extremities; she had +2 deep tendon reflexes; and she had intact sensation." R. 34 (citations omitted). The ALJ further explained that "treating providers rarely observed [Gallegos] to be in more than mild distress, which is not expected of someone as significantly limited due to pain as [Gallegos] alleged." *Id.* Finally, the ALJ reasoned that, although Gallegos "reported feeling tired due to pain and medications," she "denied experiencing fatigue/insomnia, was rarely described as fatigued by treating providers, and there are no reports of [her] falling asleep at appropriate times or having sleep related hallucinations." *Id.*

8

Case 2:19-cv-01642-SCD   Filed 09/30/20   Page 8 of 16   Document 34

Gallegos argues that the ALJ failed to provide good reasons for discounting the opinions contained in Dr. Bachhuber's medical source statement. She first accuses the ALJ of "cherry-picking" treatment notes indicating that she was in "no acute distress" without citing a medical definition of that phrase, without acknowledging findings from the same treatment notes documenting significant pain and limitations, and without considering that no treatment providers had ever considered the lack of observed distress to be inconsistent with Gallegos' alleged symptoms. Gallegos further maintains that the ALJ conflated his treating source and subjective-symptoms analyses, failed to consider that many of the treatment notes were for visits unrelated to Gallegos' osteoarthritis or fibromyalgia, and double-counted duplicate treatment notes. Next, Gallegos challenges the ALJ's reliance on normal physical findings, because no doctors ever cited such findings as inconsistent with her alleged symptoms, and the ALJ never explained how "intact sensation" and lack of "cranial nerve deficit" was inconsistent with her allegedly severe joint pain. Gallegos' final criticism is that there is no indication that the ALJ considered her lengthy treatment history with Dr. Bachhuber. *See* ECF No. 16 at 11–17; ECF No. 30 at 1–9.

I agree that the ALJ committed reversible error when weighing the medical source statement provided by Dr. Bachhuber. *First*, although it was appropriate for the ALJ to consider the objective medical evidence, the ALJ never explained *how* the physical exam findings he cited were inconsistent with the specific limitations outlined by Dr. Bachhuber. Instead, the ALJ simply concluded without explanation that these findings demonstrated that Gallegos was capable of light work. *See* R. 34. The ALJ's lack of a reasoned explanation is especially problematic given Gallegos' fibromyalgia diagnosis, which even the ALJ acknowledges accounts for at least some of her alleged pain, and which cannot be measured

9

by objective tests. *See Gerstein v. Berryhill*, 879 F.3d 257, 264 (7th Cir. 2018) ("The extent of fibromyalgia pain cannot be measured with objective tests aside from a trigger-point assessment."); *Sarchet v. Chater*, 78 F.3d 305, (7th Cir. 1996) (noting that it was "difficult to determine the severity of [Plaintiff's fibromyalgia] because of the unavailability of objective clinical tests"). As Gallegos points out, the ALJ failed to explain (and it is difficult for me to envision) how two of the specific exam findings the ALJ relied upon—that Gallegos exhibited intact sensation and no cranial nerve deficits—were inconsistent with the limitations offered by Dr. Bachhuber. The Commissioner argues that "[c]ommon sense dictates that examination findings such as normal gait, intact sensation, and normal strength in all extremities do indeed undermine Dr. Bachhuber's extreme opinions," ECF No. 29 at 5, but common sense does not substitute for a logical explanation, especially in light of Gallegos' diagnoses. *See Stenholz v. Saul*, Case No. 18-CV-1231, 2019 U.S. Dist. LEXIS 126660, at * 12 (E.D. Wis. July 30, 2019) (citations omitted) ("Stenholtz's 'relatively good function' during examination (i.e., normal muscle strength, normal gait, symmetrical reflexes, intact sensation, and no edema) is not substantial evidence that her fibromyalgia is not disabling.").

*Second*, the ALJ erred in relying on Gallegos' general appearance at office visits as a basis for rejecting Dr. Bachhuber's opinion. In not fully crediting the severity of Gallegos' alleged symptoms, the ALJ inferred that someone as significantly limited due to pain as Gallegos alleged would have presented in more than mild distress at some of her doctor visits. *See* R. 29–30. That may be a reasonable inference. *See Talbert v. Berryhill*, Case No. 17-C-1633, 2019 U.S. Dist. LEXIS 10114, at *66 (E.D. Wis. Jan. 18, 2019) (finding no error where the ALJ determined "that plaintiff's presentation at office visits undermined her contention that she experienced daily, debilitating pain precluding full-time work"). The ALJ, however,

10

repeated this inference when evaluating Dr. Bachhuber's opinion without explaining how Gallegos' lack of distress was inconsistent with any of the limitations *opined by Dr. Bachhuber*. *See* R. 34. Moreover, of the sixty-eight medical records the ALJ cited to support this inference, in one Gallegos actually did appear to be distressed, *see* R. 1412; there were three sets of duplicates, *see* R. 605 & 609, R. 836 & 840, R. 941 & 945; five times the computer-generated, no-acute-distress finding was qualified with statements like "acutely ill," R. 664, "mod[erate] distress," R. 1671, "patient in acute pain," R. 1656, "patient appears uncomfortable," R. 1283, and "holding abdomen and appears uncomfortable," R. 1517; many documented pain or other symptoms despite noting that Gallegos appeared to be in no acute distress, *see* R. 531, 645, 660, 695, 716, 720, 784, 808, 833, 941 & 945, 1283, 1287, 1293, 1296, 1299, 1302, 1362, 1384, 1451, 1671, 1674; and most were for issues wholly unrelated to Gallegos' arthritic/fibromyalgia pain (namely for gynecological, obstetrical, gastrointestinal, or dermatological issues), *see* R. 531, 592, 601, 605 & 609, 624, 639, 664, 667, 671, 677, 680, 705, 716, 720, 817, 833, 836 & 840, 857, 864, 866, 872, 894, 897, 904, 941 & 945, 949, 964, 973, 984, 992, 1008, 1013, 1021, 1025, 1350, 1384, 1412, 1439, 1451, 1468, 1507, 1517, 1535, 1564, 1573, 1578, 1630, 1652, 1656. Thus, without further explanation, it cannot be assumed that these records were inconsistent with Dr. Bachhuber's opinion. *See Stone v. Berryhill*, Case No. 3:18-CV-023 JD, 2019 U.S. Dist. LEXIS 35750, at *12 (N.D. Ind. Mar. 6, 2019) (citation omitted) ("Thus, without an explanation of what the recording medical professionals meant by 'no acute distress,' it cannot be simply assumed, as the ALJ did, that they meant that Stone did not experience back pain to the degree that she alleged.").

*Finally*, the ALJ did not explain how the alleged lack of evidence supporting Gallegos' claims of chronic fatigue was inconsistent with Dr. Bachhuber's opinion. Dr. Bachhuber did

11

list fatigue as one of Gallegos' symptoms. *See* R. 932. But he repeatedly indicated that Gallegos' functional limitations stemmed from her chronic pain; he never mentioned fatigue. *See* R. 932–35. The ALJ did not make any attempt to link any of Dr. Bachhuber's opined limitations with fatigue. Rather, it appears that the ALJ merely copied and pasted from his analysis of Gallegos' subjective allegations. *Compare* R. 29 *with* R. 34. The bridge between the alleged lack of evidence of chronic fatigue and the ALJ's decision to reject Dr. Bachhuber's opinion is nonexistent.

Because the ALJ failed to build an accurate and logical bridge between the evidence and his decision to reject Dr. Bachhuber's opinion, the RFC assessment and the ALJ's findings at steps four and five are not supported by substantial evidence.

## II.     Reliability of the VE's Job-Number Estimates

Gallegos also argues that the ALJ erred in relying on the VE's job-number estimates. At step five of the sequential evaluation process, the Commissioner had the burden of demonstrating the existence of significant number of jobs in the national economy that Gallegos could perform. *See* 20 C.F.R. §§ 404.1560(c)(1), 416.960(c)(1). To obtain a job-number estimate at Gallegos' hearing, the ALJ followed the common path of seeking the assistance of a vocational expert. The VE testified that a person with Gallegos' age, education, work experience, and RFC could still work as mail clerk, in food processing or food preparation, and in cleaning or housekeeping. R. 80–82. According to the VE, those jobs existed in significant numbers in the national economy. He estimated that across the country there were approximately 100,000 mail clerk jobs; 400,000 food prep jobs; and 1,000,000 light-duty cleaning jobs. R. 81–82. The VE arrived at these numbers by "extrapolating" from the

*OES* and reducing those numbers by "[a]bout 50 percent." R. 91–92. In his written decision, the ALJ adopted the job-number estimates provided by the VE at the hearing. *See* R. 39.

Gallegos maintains that the VE's method is arbitrary. *See* ECF No. 16 at 17–19; ECF No. 30 at 9–12. I agree. "In the context of job-number estimates, . . . the substantial evidence standard requires the ALJ to ensure that the approximation is the product of a reliable method." *Chavez v. Berryhill*, 895 F.3d 962, 968 (7th Cir. 2018) (citing *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002); *McKinnie v. Barnhart*, 368 F.3d 907, 910 (7th Cir. 2004)). Thus, "[a] finding based on unreliable VE testimony is equivalent to a finding that is not supported by substantial evidence and must be vacated." *Chavez*, 895 F.3d at 968 (quoting *Britton v. Astrue*, 521 F.3d 799, 803 (7th Cir. 2008)). "If the basis of the vocational expert's conclusions is questioned at the hearing, . . . then the ALJ should make an inquiry . . . to find out whether the purported expert's conclusions are reliable." *Donahue*, 279 F.3d at 446. "[A]ny method that the agency uses to estimate job numbers must be supported with evidence sufficient to provide some modicum of confidence in its reliability." *Chavez*, 895 F.3d at 969. The VE here testified that he applied a reduction of about fifty percent to each of the job numbers he extrapolated from the OES. However, he failed to explain how this crude methodology yielded sufficiently accurate job-number estimates. *See Rooney v. Saul*, Case No. 18-CV-2030-SCD, 2020 U.S. Dist. LEXIS 115027, at *20–23 (E.D. Wis. June 30, 2020) (fifty percent reduction in all cases); *Dolezar v. Saul*, Case No. 19-CV-0072-LA, at 7 (E.D. Wis. Apr. 29, 2020) ("arbitrarily" reducing BLS data by fifty percent).

The Commissioner unpersuasively argues that Gallegos "did not sufficiently challenge the expert's methodology." *See* ECF No. 29 at 11–13. In her pre-hearing subpoena request, Gallegos explicitly objected to the VE's anticipated testimony concerning job-number

13

estimates "unless the expert provides a foundation demonstrating a validated scientific methodology which supports that opinion." R. 382. At the hearing, Gallegos' lawyer questioned the VE about the source of his job numbers (the OES) and how the VE modified those numbers based on the lack of one-to-one correlation with the DOT. R 91–92. Following the hearing, Gallegos submitted a brief that challenged the VE's methodology. R. 461–62. As I said in *Rooney*, these efforts were sufficient to trigger the ALJ's duty to ensure that the VE's estimates were the product of a reliable method. *See also Donahue*, 279 F.3d at 446; *Courtney v. Berryhill*, 385 F. Supp. 3d 761, 763–64 (W.D. Wis. 2018) (dismissing Commissioner's argument that Plaintiff waived challenge to VE's testimony by not objecting at the hearing because "the claimant does not need to make a formal objection. . . . He needs only to cross-examine the expert and elicit statements that call into question the reliability of his conclusions.").

The Commissioner makes a few other efforts to save the VE's testimony, but each is unavailing. The Commissioner first suggests that any error was harmless because the VE identified nearly 1.9 million jobs that person like Gallegos could perform. *See* ECF No. 29 at 10. The Seventh Circuit, however, rejected a similar argument in *Chavez*. *See Chavez*, 895 F.3d at 970 ("We recognize that the VE identified three suitable jobs for Chavez and then estimated that, in total, nearly 500,000 of those jobs existed in today's economy. The observation leads nowhere, however, as each of the VE's job estimates was the product of the equal distribution method, and nothing in the administrative record allows us to conclude with any reliability that the estimates reasonably approximate the number of suitable jobs that exist for Chavez.").

Next, the Commissioner attempts to distinguish *Chavez* because the VE here did not describe an unreliable method. *See* ECF No. 29 at 11. It's true that the VE here did not specifically explain how he arrived at his job numbers. Rather, he vaguely claimed to have

14

"extrapolate[ed]" from the OES, before he applied his fifty percent reduction. *See* R. 91–92. The Commissioner blames Gallegos for not asking *how* the OES numbers were extrapolated or why the reduction was fifty percent. But binding Seventh Circuit precedent indicates that once Gallegos' lawyer questioned the VE about his methodology and the VE failed to describe with any detail what that methodology was, the ALJ should have made his own inquiry. *See Donahue*, 279 F.3d at 446.

The Commissioner also asserts that Gallegos misrepresented the VE's testimony in his post-hearing briefing. *See* ECF No. 29 at 13. I agree that Gallegos did not mention that the VE extrapolated the date from the OES before he performed the fifty percent reduction. But all this shows is that the VE's description of his methodology was unclear. Moreover, regardless of what this extrapolation entailed, the VE failed to provide any testimony that would support the reliability of the second step of his methodology; in other words, the VE never explained why he believed that his fifty percent reduction produced reliable job-number estimates.

Finally, the Commissioner maintains that the ALJ "reasonably addressed Plaintiff's concerns in his decision." *See* ECF No. 29 at 13. I disagree. The ALJ indicated that Gallegos' lawyer did not object to the VE's qualifications or "inquire as to whether the vocational expert actually relied on any of [the] presumed discredited sources." R. 21. The problem here, however, is not the VE's qualifications or sources—it's his methodology. The ALJ further overruled Gallegos' objection to the VE's job-number testimony because "the numbers provided were based upon his education, training, and experience." R. 21. In fact, the VE said no such thing. What the VE did say was that his testimony about limitations or allowances included in the hypothetical that were not addressed in the DOT was based on his experience.

15

R. 85. The VE never cited his education, training, or experience as the basis for his job-number estimates.

Because the ALJ failed to ensure that the VE's job-number estimates were the product of a reliable method, his step-five finding is not based on substantial evidence.

## CONCLUSION

For all the foregoing reasons, I find that the ALJ erred in evaluating the opinion of Gallegos' primary care physician and failed to ensure that the VE's job-number estimates were reliable. Based on this record, however, I cannot determine whether Gallegos was disabled as of May 19, 2014. Accordingly, it is necessary to remand this matter to the Commissioner for a new step-five hearing.

The Commissioner's decision is **REVERSED**, and this action is **REMANDED** pursuant to sentence four of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), for further proceedings consistent with this decision. The clerk of court shall enter judgment accordingly.

**SO ORDERED** this 30th day of September, 2020.

STEPHEN C. DRIES
United States Magistrate Judge